UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                      :

UNITED STATES OF AMERICA,

                                      :

        - v. -                            20 Cr. 354 (LJL)

                                      :

ANTHONY GUZZONE,

                                      :

              Defendant.

                                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<br>

## GOVERNMENT'S SENTENCING MEMORANDUM

<br><br>

                                     **AUDREY STRAUSS**
                                     **Acting United States Attorney for the**
                                     **Southern District of New York**

<br><br>

**DAVID RAYMOND LEWIS**
**Assistant United States Attorney**

**STANLEY J. OKULA, JR.,**
**Senior Litigation Counsel.**
**Department of Justice—Tax Division**

        - Of Counsel -

**TABLE OF CONTENTS**

Introduction ........................................................................................................................1

I.    Relevant Facts ...........................................................................................................2

      A.    The Defendant's Educational Background and Work History .................................2

      B.    The Offense Conduct and Factually Related Misconduct .......................................3

            1.    The Underlying Bribery (Honest Services Fraud) Scheme ............................3

            2.    The Types and Totals of Bribes Received by Guzzone and Others ................6

            3.    The Tax Fraud Scheme ...................................................................................7

      C.    The PSR ...................................................................................................................8

II.   Sentencing Guidelines Discussion ...........................................................................9

III.  3553(a) Analysis .....................................................................................................11

      A.    Nature and Circumstances of the Offense .............................................................11

      B.    History and Characteristics of the Defendant .......................................................12

      C.    The Need to Afford Adequate Deterrence ..............................................................15

      D.    The Need to Avoid Unwarranted Sentencing Disparities .......................................20

      E.    The Defendant's Variance Arguments ....................................................................22

IV.   Restitution ................................................................................................................25

Conclusion ......................................................................................................................26

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :

**UNITED STATES OF AMERICA,**

                                      :

        - v. -                         **20 Cr. 354 (LJL)**

                                          :

**ANTHONY GUZZONE,**

                                      :

           **Defendant.**

                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM

The United States respectfully submits this memorandum in connection with the sentencing of defendant Anthony Guzzone, scheduled for January 19, 2021.

### Introduction

On September 29, 2020, Guzzone pleaded guilty to a one-count Information charging him with tax evasion for the tax years 2010 through 2017. The allegations in the Information, the admissions made by the defendant during his guilty plea, and the other information contained in the Pre-sentence Investigation Report ("PSR") submitted by the U.S. Probation Office ("Probation") demonstrate that the defendant — a well-educated, highly compensated, construction-industry official — led  a multi-year fraud scheme to solicit and pocket unlawful payments in the form of bribes and kickbacks. Guzzone then furthered that scheme by willfully failing to report the illicit income on his income tax returns, resulting in significant tax evasion. The defendant's tax crimes spanned eight separate tax years and involved not only the willful omission of over $1,450,000 of bribe income from his federal and state tax returns, but untold losses to his employer through the underlying honest services fraud.

1

The reason behind the defendant's criminal activity can be summed up in two words: unmitigated greed. Indeed, as the PSR makes clear, during the years when he was serving as a leader of the bribery/kickback scheme, Guzzone was being paid hundreds of thousands of dollars per year by Bloomberg LP ("Bloomberg"), providing him a comfortable lifestyle and economic security. For that reason, and the other facts set forth in the PSR and below, we respectfully submit that the defendant's conduct is deserving of a sentence within the stipulated Guidelines range.

## I.   RELEVANT FACTS[1]

### A.   The Defendant's Educational Background and Work History

The defendant is a highly educated man.   He received first his BS degree (in architecture) in 1992 from New York Institute of Technology.   Later, after commencing work in the construction industry, Guzzone obtained a Master of Science degree from NYU, in the field of construction and project management.   PSR ¶¶ 75-76.   Between 2001 and 2017, Guzzone held various construction management positions at Bloomberg, ultimately attaining the highly-paid position of Global Project Manager.   In that position, Guzzone had responsibility for oversight of all of Bloomberg's global construction projects and the teams of individuals who managed those projects.   *Id.* at ¶ 80.   Notably, while working at Bloomberg, the defendant was highly compensated, earning up to $400,000 annually (including a yearly bonus) before he was terminated by Bloomberg in 2017 as a result of his involvement in the bribery scheme.   *Id.*

---

[1] The facts described in this section are based on the PSR, documents that the Government gathered in its investigation, and Government interviews of various witnesses.

### B.      The Offense Conduct and Factually Related Misconduct

The facts concerning the defendant's offense conduct will not be repeated herein at length, as they are set forth in the Information and the PSR. Nonetheless, we highlight certain aspects of the defendant's lengthy and corrupt offense conduct and the related honest-services fraud because those facts speak volumes about the extent of the defendant's criminal activity, and both the direct and indirect harm caused by those interwoven criminal schemes.

Of course, all of the defendant's misconduct, whether the subject of criminal conviction or not, should be taken into account by the Court when making its ultimate assessment of the proper sentencing prescription. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct . . . ."); *Pepper v. United* States, 562 U.S. 476, 480 (2011) ("Highly relevant – if not essential – to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics") (citation omitted).

### 1.   The Underlying Bribery (Honest Services Fraud) Scheme

Because Guzzone's offense conduct – the tax evasion scheme that spanned eight tax years – stemmed from and indeed furthered the underlying bribery/honest services fraud scheme, it is helpful to review briefly the fraud Guzzone led with respect to his employer.   As detailed in the PSR and not objected to by the defendant, Guzzone and his cohorts were charged in a 72-count indictment with a massive scheme "to steal money from Bloomberg LLP by inflating subcontractor bids, creating fictitious change and/or work orders, and misappropriating unused allowance money."   PSR ¶¶ 48.   As part of that scheme, Guzzone and other construction managers at Bloomberg and Turner Construction conspired with subcontracting companies to "assist" in carrying out thefts from Bloomberg by "bid-rigging, falsifying business records, and the paying

3

[and receiving] of commercial bribes." *Id.*   And the overarching scheme was concealed, in part, through the "laundering of criminal proceeds." *Id.*

Guzzone was no idle or mid-level participant in the bribery scheme.   Rather, as stipulated in the plea agreement, he was one of the leaders and organizers of the scheme, which commenced no later than 2010, continued through 2017, and involved five or more participants as bribe-receivers — including Javier Paulino, Michael Campana, and Marilyn Francisco[2] at Bloomberg, and Ronald Olson and Vito Nigro of Turner Construction. *Id.* at ¶ 2.   In addition, the scheme involved dozens of sub-contractors from whom Guzzone and his bribe-receiving cohorts solicited the illicit payments—-some totaling hundreds of thousands of dollars.

Although the bribery scheme had various permutations, at its core it involved the steering of work by Guzzone and others to sub-contractors who agreed to pay bribes for the work contracts. *Id.* at ¶ 14. The cultivation of some of the sub-contractors occurred over time, as Guzzone and the other corrupt Bloomberg and Turner officials initially requested those contractors to pay for restaurant and bar tabs (typically costing thousands of dollars), and for elaborate retirement and departure parties for Bloomberg and Turner employees.   After this initial cultivation, the sub-contractors were flat-out directed by Guzzone, Nigro, Paulino, and the others to add tens or hundreds of thousands of dollars to their construction bids. When Bloomberg paid the inflated amounts to the sub-contractors, those sub-contractors would turn over the ill-gotten payments to

---

[2] Campana, Olson, and Nigro have each been charged in related cases in this district.   *United States v. Campana*, 19 Cr. 859 (DLC); *United States v. Olson,* 20 Cr. 356 (PKC); *United States v. Nigro,* 20 Cr. 370 (AT).   Francisco, another Bloomberg managerial employee, pleaded guilty in New York Supreme Court to a commercial bribery-related offense, based on her receipt of bribes from a sub-contractor. Paulino, who is cooperating with New York State authorities and, derivatively, the U.S. Attorney's Office, also pleaded guilty in New York State Supreme Court— to grand larceny and commercial bribe charges. He has yet to be sentenced.

Guzzone and the other faithless employees of Bloomberg and Turner, principally in cash. The cash was generated when some of the criminally culpable sub-contractors cashed checks at check-cashers in Manhattan and elsewhere, and delivered the cash to Guzzone, Nigro, Paulino, and others at job sites and restaurants. On other occasion, as specified more fully below, Guzzone accepted in-kind bribes in the form of extensive contractor work performed at Guzzone's residence, or tickets to expensive events such as the Super Bowl.  In so doing, Guzzone often used another individual who frequently worked at the Bloomberg construction sites — "Co-conspirator-1" for purposes of this memorandum[3] — to communicate the demands for in-kind bribes, such as home repair and construction work.

As the senior construction official at Bloomberg, Guzzone could assure that the bribe-paying contractors got particular jobs, frequently by having other sub-contractors put in accommodating bids——that is, sham bids that were deliberately higher (because Guzzone and his co-schemers had disclosed to the sham bidders what the bribe-payors' bids for the jobs were going to be).   In this way, Guzzone corrupted the bidding process that would otherwise have assured his employer that the low — but fully qualified — bidders got the jobs.

---

[3] "Co-conspirator-1" refers to ███████████████████████

### 2.   <u>The Types and Totals of Bribes Received by Guzzone and Others</u>

As noted above, Guzzone and his co-schemers typically received the bribes in the form of cash.   But on certain occasions — such as when the sub-contractors had difficulty generating the significant amounts of cash demanded by Guzzone and the others, or when the conspirators sought to disguise the bribe payments — Guzzone and his co-schemers solicited in-kind bribes.   For Guzzone personally, those in-kind bribes included repeated construction work at his New Jersey residence by the following types of contractors: glass and metal contractors, who provided extensive wrought iron fences, circular stairways, and construction of an outdoor bar area; HVAC contractors, who performed air conditioning and heating services and installations; and glass and tile contractors, who supplied and installed tile. All of this work was provided without charge to Guzzone.   In addition, when the construction work was being performed at Guzzone's home, had a company that supplied dumpsters for Bloomberg deliver to Guzzone's home a dumpster to haul away the construction debris.   That dumpster was billed to Bloomberg, as were dumpsters that Co-conspirator-1 directed to be provided for the renovation of other conspirators' homes.   In total, the underlying bribery/honest services fraud involved the receipt by the conspirators of over $6 million in bribes, outlined roughly as follows:

6



### 3. The Tax Fraud Scheme

The eight-year tax fraud offense to which Guzzone pleaded guilty was directly tied to his fraud on Bloomberg. In particular, the "affirmative acts of evasion" by which Guzzone effectuated the tax evasion scheme between 2010 and 2018 – involving the concealed receipt of more than $1.3 million of cash, and the surreptitious receipt of in-kind bribes largely tied to significant home renovation expenses and Super Bowl tickets[4] – served both to disguise the

---

[4] In connection with his guilty plea, Guzzone declared that he had not accepted Super Bowl ticket bribes, and produced to the Government a check showing he paid for his own ticket for the 2016 Super Bowl. While it is true that Guzzone footed the bill for his 2016 ticket (when a probe of Turner Construction caused him and his cohorts to exercise caution and pay for their own tickets), the Government is prepared to prove at a hearing that Guzzone – like Nigro and Paulino —

manner by which the defendant was receiving illegal payments in violation of the trust he owed to Bloomberg, his employer, and to hide that ill-gotten income from the IRS (and state tax authorities).

For each of the tax years 2010 through 2017, Guzzone caused the preparation, signing, and filing with the IRS of Individual Income Tax Returns, Forms 1040, which falsely and fraudulently omitted the significant bribery income he was receiving during those years.  To effectuate the preparation of those false returns, Guzzone provided false information to his New Jersey-based preparer.  Worse still, because the 2010-17 returns were jointly filed with his spouse, he caused her name to be attached to the false filing he orchestrated.

## C.   **The PSR**

In connection with Guzzone's sentencing, Probation prepared a PSR.  As calculated by Probation and as stipulated by the parties, Guzzone's adjusted offense level is 23. The breakdown of the defendant's Sentencing Guidelines calculation is as follows:

- A base offense level of 16, pursuant to U.S.S.G. § 2T4.1(F), based on an aggregate tax loss of more than $250,000 and less than $550,000.    PSR ¶¶ 2(b), 35.

- A two-level upward adjustment, pursuant to U.S.S.G. § 2T1.1(b)(1), because the defendant failed to correctly identify the source of income exceeding $10,000 in any year from criminal activity. PSR ¶¶ 2(c), 36.

- A four-level upward adjustment, pursuant to U.S.S.G. § 3B1.1(a), because the defendant was an organizer or leader of a criminal activity that involved five or more people or was otherwise extensive. PSR ¶¶ 2(d), 39.[5]

---

accepted bribes in the form of ticket purchases for the 2012 (Indianapolis), 2013 (New Orleans), and 2015 (Arizona) Super Bowls. The payments by the sub-contractors included not only the tickets but rooms and lavish dinners and tailgates. 2014 was not included because it involved a Super Bowl based in New York.

[5] Although Guzzone's role as an organizer and leader was more prominent in connection with the execution of the bribery/honest services scheme, the upward adjustment under U.S.S.G. § 3B1.1(a) is nonetheless applicable.  As the Second Circuit has made clear in the context of leadership

8

- A two-level upward adjustment, pursuant to U.S.S.G. § 3B1.3, because the defendant's activity in the kickback and honest services scheme amounted to an abuse of his position of trust within Bloomberg. PSR ¶¶ 2(e), 38.[6]

- A three-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b).   PSR ¶¶ 2(f), 43-44.

- A resulting total offense level of 23. PSR ¶¶ 2(g).

The defendant has no criminal history points.   PSR ¶ 2(h).   Thus, with a final offense level of 23 and a criminal history category of I, Guzzone's Guidelines analysis, according to the final PSR, yields a final advisory Guidelines range of 46-57 months. PSR ¶ 93.   This is the same range that the parties stipulated to in the plea agreement. *Id*. ¶ 2(i).[7]

## II.   SENTENCING GUIDELINES DISCUSSION

Although the Guidelines are no longer mandatory, they continue to play a critical role in trying to achieve the "basic aim" that Congress sought to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar

---

enhancements under the Sentencing Guidelines, "[t]he district court's inquiry is not limited to defendant's role in the count of conviction; rather, the court may take all 'relevant conduct' into account." *United States v. Brinkworth*, 68 F.3d 633 (2d Cir.1995).

[6] Even though the technical "victim" of Guzzone's tax evasion offense was the Internal Revenue Service, an abuse of trust enhancement is appropriate because the defendant's conduct in the bribery/honest services scheme was directly connected to the tax misconduct and, at the very least, constituted relevant conduct. *See United States v. Friedberg*, 558 F.3d 131, 133-34 (2d Cir. 2009) (upholding abuse of trust enhancement in tax evasion prosecution where underlying unreported income stemmed from uncharged embezzlement scheme, where defendant abused position of trust).

[7] Guzzone also has pleaded guilty in New York State Supreme Court to grand larceny in the first degree, a class B felony, in violation of New York Penal law Section 155.42, Indictment No. 04038-2018, thus resolving all of the outstanding bribery, embezzlement, and money laundering charges he faced in state court. In state court, where Guzzone will be sentenced after his federal sentencing, the defendant faces an indeterminate sentence of 3 years to 9 years based on his state plea.

ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005); *see also United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker*/*Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").   "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).   The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States* v. *Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id.* at 112; *see also United States* v. *Corsey,* 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. *See Crosby*, 397 F.3d at 112. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances. *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

### III. <u>Section 3553(a) Analysis</u>

The Government respectfully submits that a sentence within the Stipulated Range of 46 to 57 months' imprisonment is necessary to reflect the seriousness and gravity of Guzzone's offense conduct, provide just punishment, afford general deterrence, and promote the respect for the law.

#### A. <u>Nature and Circumstances of the Offense</u>

The Supreme Court has long-recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received." *Spies* v. *United States*, 317 U.S. 492, 495 (1943). The orderly operation of government and our society relies on

its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes.   Indeed, as the Second Circuit has recognized, "tax crimes represent an especially damaging category of criminal offenses," which "strike at the foundation of functioning government." *United States v. Zukerman*, 897 F.3d 423, 427 (2d Cir. 2018) (cleaned up). *See generally Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) ("[t]axes are what we pay for a civilized society. . . .") (Holmes, *J.*, dissenting).

The eight-year tax fraud that Guzzone perpetrated in this case cost the U.S. Treasury, and this nation's honest taxpayers, more than $450,000 in actual losses, as well as the interest that has accumulated on these unpaid taxes over time.   Moreover, it is critical to take into account that the offense conduct in this case – that is, a tax evasion scheme spanning eight tax years – is further aggravated when one considers that the tax misconduct served to further the underlying bribery/honest services fraud scheme that involved not only Guzzone (as an organizer and leader) but a host of supervisors at Bloomberg and Turner Construction.   Stated otherwise, it is important to consider that the defendant's false tax reporting served to perpetuate and conceal the multi-million dollar kickback scheme orchestrated by Guzzone and other senior construction executives. This prolonged and serious criminal conduct warrants a term of incarceration within the Stipulated Range.

### B.   <u>History and Characteristics of the Defendant</u>

Unlike many of the defendants who appear before this Court, Guzzone has enjoyed significant financial stability and comfort as a well-educated, talented, and successful construction official — an advantage many people can only dream about.   But that success – and the more-

than-$400,000 salary that came along with it in 2017 – was not enough.   Despite his success and financial security, Guzzone engaged in a significant tax fraud scheme that involved not only cheating multiple tax authorities but also an underlying multi-million dollar fraud scheme that Guzzone organized and led, and which involved a widespread web of deceit and significant financial harm to his employer.   Put simply, this was a crime of opportunity driven by avarice and greed, not necessity. Guzzone's criminal conduct, when viewed in its entirety, clearly supports the conclusion that he was motivated by a desire to maintain a more comfortable lifestyle, even if it meant breaking the tax laws and deceiving his employer for years.

Guzzone has submitted numerous letters attesting to his positive personal and professional qualities and expressing support.   It is, of course, appropriate for the Court to take these letters into account in connection with sentencing.   However, these attestations to Guzzone's positive qualities do not distinguish him from the typical defendant in a white-collar case and do not warrant a departure or variance from the Stipulated Range.   As Judge Marrero astutely observed in another case, such a collection of letters

> falls into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant.   The list of their achievements and virtues is long and impressive.   Let  us count the ways.   At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners.   To their community's charities and public causes they are generous patrons and sponsors.

*United States* v. *Regensberg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010); *see also United States* v. *McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not

think highly of him or her"); *United States* v. *Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)).   The Government does not question that Guzzone is a talented and accomplished person who has helped others.   But these positive qualities, while admirable, do not meaningfully set Guzzone apart from other similarly situated white-collar defendants—individuals who, although high-achieving and successful in their fields, nonetheless choose to steal and defraud, and to hide that side of themselves, as Guzzone ostensibly did, from their family, friends, and colleagues.

To the extent that there is any suggestion by Guzzone, or those who wrote letters in his support, that his humiliation and loss of social or professional standing as a result of his guilty plea warrant a lighter sentence, that claim should be rejected.   Any notion that highly successful white-collar criminals should be sentenced more lightly than defendants of a lower socioeconomic status cannot not be countenanced.   "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."   *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life.   '[N]one of these things are [his]

14

sentence.   Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)); *United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). And, as the Seventh Circuit has pointedly observed:

> [N]o "middle class" sentencing discounts are authorized.   Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class.   But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

Finally, as discussed above, this is emphatically *not* a case where the offense conduct was wildly aberrant or prompted by a brief lapse in judgment and where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life.   For at least eight years, Guzzone methodically perpetrated a tax fraud scheme designed to cheat the IRS and New Jersey State taxing authorities out of large sums of money. That cheating – which also involved an extensive, underlying honest services fraud of which Guzzone was an organizer and leader – involved lies to Guzzone's accountant and the signing of multiple false tax returns under penalty of perjury, year after year.   Put simply, this prolonged, multi-victim, greed-driven criminal conduct warrants serious punishment.

## C.   <u>The Need to Afford Adequate Deterrence</u>

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct."

18 U.S.C. § 3553(a)(2)(B).   General deterrence is particularly important in cases like this because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud. A recent IRS study of tax compliance estimates that only 83.1% of individuals are compliant with their tax obligations, leaving a yearly tax gap of over $458 billion dollars in unreported and uncollected taxes. *See* "Tax Gap Estimates for Tax Years 2008-2010," April 2016, *available at* www.irs.gov/pub/newsroom/tax%20gap%20estimates%20for%202008%20through%202010.pdf . This means that hundreds of billions of dollars are lost every year because people like Guzzone — who otherwise fully enjoy the myriad public benefits that the tax system supports — choose to shirk their responsibilities as taxpayers.   Widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits the Court's strong consideration when imposing sentence. Put bluntly, meaningful sentences must be given in cases such as this to forewarn others of the consequences for engaging in multi-year tax fraud.   *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect."); W. Boning, J. Guyton, R. Hodge, & J. Slemrod, *Heard it through the Grapevine: The Direct and Network Effects of a Tax Enforcement Field Experiment on Firms*, Journal of Public Economics 190 (2020) ("The effects of tax enforcement directed at one taxpayer are not limited to that taxpayer's behavior. Increased enforcement deters evasion . . . by changing taxpayers' perceptions of the probability that evasion will be detected and punished")..

The importance of affording general deterrence through meaningful sentences is particularly acute in criminal tax cases.   As a result of the significant resources required to mount

16

a criminal tax prosecution, such prosecutions are relatively rare.   As the Sentencing Commission

explained:

> The criminal tax laws are designed to protect the public interest in preserving the
> integrity of the nation's tax system. Criminal tax prosecutions serve to punish the
> violator and promote respect for the tax laws. Because of the limited number of
> criminal tax prosecutions relative to the estimated incidence of such violations,
> deterring others from violating the tax laws is a primary consideration underlying
> these guidelines. Recognition that the sentence for a criminal tax case will be
> commensurate with the gravity of the offense should act as a deterrent to would-be
> violators.

U.S.S.G. ch. 2, pt. T, introductory cmt.   Where the incidence of prosecution is lower, the level of

punishment must be higher to obtain the same level of deterrence.

The need for general deterrence is greatest in cases involving particularly lucrative and

difficult-to-detect tax fraud schemes.   *See United States v. Zukerman*, 897 F.3d at 429 (general

deterrence "has a particularly important role" due "to the significant resources required to monitor

and prosecute tax crimes," which "cost the government hundreds of billions of dollars annually";

quoting and finding "eminently reasonable" district court's findings with respect to deterrence);

*United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general)

deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult

to detect and punish, since both attributes go to increase the expected benefits of a crime and hence

the punishment required to deter it."); *see also United States* v. *Hassebrock*, 663 F.3d 906, 922

(7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax evader

when the district court explained that "a sentence of probation would not promote respect for the

law, but encourage people to flaunt it").   Thus, in order to provide adequate general deterrence,

sentences for multi-year tax fraud schemes must be substantial.

Judge Weinfeld aptly observed, in a pre-Guidelines setting, the important deterrent value of incarceration in tax cases:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment. The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns. I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to, other people in the community.

*United States* v. *Tana*, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13); *see also United States* v. *Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.").

Likewise, in a case involving a construction executive who diverted corporate receipts over a three-year period, resulting in a tax loss of between $250,000 and $550,000 and a Sentencing Guidelines range of 18 to 24 months, Judge Hellerstein imposed an 18-month within-Guidelines sentence on the 54-year-old, first-time offender, explaining that:

> I think the obligation to pay taxes is basic to our civilization. It makes it possible to have a lawful society. You read every day of crimes and violence in our country. But so much so in so many other countries where people can't get out of their house without fearing their lives. Where the path of getting food is strewn with threats and violence against them.
>
> In order to have a society, you must have money. You must be able to pay what society requires. And its basic functions of policing and other functions of making sure there is a safety net under people. If people don't pay their taxes, they cheat each other. You're not paying taxes cheats me. If I don't pay my taxes, I cheat you. It's as bad, in many ways, as ripping off the delivery worker that the last fellow did. You're ripping off everybody else by not paying your share of taxes. So I look upon this and I think the guidelines have it right here. I think a year and a half, 18 months, is a just sentence. I impose it.

18

> I think you're going to have to reflect on what you did and the seriousness of what you did. You just can't make it good by paying the back tax. You've got to understand that when you do something bad, you get punished. It's got to be a lesson to everyone else. Everyone else is tempted to draw a line and cheat a little bit, get an extra edge.

Sentencing Tr., *United States* v. *Joseph Ciccarella*, 16 Cr. 738 (AKH), at 22-23 (attached hereto as Exhibit A).

Finally, as Judge Denis L. Cote trenchantly observed when imposing sentence on husband and wife Jeffrey and Marla Stein, a physician and an attorney who carried out a joint scheme to cheat on their taxes for multiple years, including cheating on the employment taxes relating to an off-the-books domestic employee:

> The presentence report emphasizes the greed involved with these offenses. Besides the greed, I think of the deceit, the disloyalty shown to a household employee and to an accountant, their irresponsibility as citizens. After all, taxes [are] one of the few things our country asks of most of us. One of the few things we can do as part of citizenship and living in this country is to pay our taxes. We all benefit from it. We don't need to think about whether somebody is taking care of our security as a nation, or, more locally, our police department or our fire department. We pay our taxes, we come to expect these things, and, of course, there are a whole host of services our government provides to us, all of us, every citizen, but I like to think about writing that tax check as also a way of our support for our government taking care of those who are most in need in society. Let me give just one example here that hopefully will strike home for the defendants. The defendant went to high school in New York City at one of the best high schools in our country, the Bronx High School of Science. Tax dollars provided his education. So I have been thinking about this sentence. Here I have two people who have great talent, been very successful in life, and who I am going to send to prison because the issues of general deterrence are just too important not to do that.

*United States v. Jeffrey Stein & Marla Stein*, 15 Cr. 195 (DLC) (July 31, 2015; Tr. at 7-8) (attached hereto as Exhibit B).

In short, compliance with the Internal Revenue Code will be unattainable if the general public believes there are no meaningful repercussions for failing to comply with the tax laws.

Sentencing Guzzone to a within-Guidelines term of incarceration is, therefore, necessary to send the message to others in our society that systematic and repeated efforts to cheat on one's taxes (and to shamelessly steal from one's employer) will be met with serious punishment.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

The Sentencing Guidelines were promulgated, in significant measure, to minimize disparities in federal sentences. Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor that the Court must consider pursuant to 18 U.S.C. § 3553(a)(6).   To that end, the Government attaches for the Court's consideration a chart of sentences in other recent tax cases (or cases that had a significant tax component), including cases with comparable loss amounts to the loss amount in this case.   (*See* Exhibit D, attached hereto (the "Sentencing Chart")).   The Sentencing Chart breaks out the sentences imposed and various other sentencing data in a broad variety of criminal tax contexts.

Although the Government believes that there is significant utility in having Your Honor consider sentencings in other tax cases, we note our acute awareness that, at best, such guidance can get the Court only so far.   Every case is unique; every individual defendant is unique.   We do not mean to suggest otherwise.   The reason for our reference to the other relevant sentences is straightforward: while we fully recognize that the Government's recommendation in this case calls for a substantial, within-Guidelines sentence, similar sentences have been meted out in cases involving multi-year criminal conduct and tax losses.

One sentencing contained in the Sentencing Chart — for Guzzone's co-schemer and subordinate, Michael Campana — illustrates the importance of avoiding sentencing disparities, and of having sentences within a case that are mutually consistent.   For several reasons,

Campana's adjusted Guidelines range was much lower than Guzzone's, at 24 to 30 months.   In contrast to Guzzone, Campana participated in the fraud for only three tax years, had a tax deficiency approximately one-third of Guzzone's, and played no leadership role.   Also importantly, Campana doubly demonstrated his acceptance of responsibility by voluntarily paying his entire outstanding tax obligation prior to sentencing.   In July 2020, Judge Cote sentenced Campana to a Guidelines sentence of 24 months, at the bottom of Campana's applicable sentencing range.   Judge Cote based this sentence on, among other things, Campana's lower level role in the scheme and the fact that Campana made full restitution of the tax deficiency, totaling $155,000, at the time of sentencing.   *United States v. Michael Campana*, 20 Cr. 354 (DLC) (July 24, 2020; Tr. at 22-25) (attached hereto as Exhibit C). By contrast, Guzzone was Campana's supervisor—both at Bloomberg and as part of his overall leadership role in the criminal scheme, and participated in the scheme for more than twice as long, enabling him to receive over three times the amount of bribes that Campana received.   Surprisingly, Guzzone has chosen to pay just $10,000 in restitution to date, despite being aware for years of the amounts he owed and the financial resources to make full payment. It would work an unfair disparity if Guzzone, an organizer who was part of the bribery scheme from the beginning, pocketed three times more in bribes than Campana, and has paid only a pittance of his restitution, were not to receive a Guidelines sentence for that conduct as did Campana.

This country depends largely upon voluntary compliance with the internal revenue laws by all citizens, regardless of wealth or status.   That system of voluntary compliance would crumble if those people owing taxes believed they could cheat with impunity or that the sanction that they would face when caught would not be severe.

In sum, general deterrence in cases like this is vitally important – indeed, essential – to the orderly and fair administration of our nation's tax law system.

**E.  The Defendant's Variance Arguments**

Guzzone's arguments in support of a variance from the applicable Guidelines range are unpersuasive.   To be sure, his life has included noteworthy and positive aspects and, unlike many defendants who appear before the Court, he enjoys a strong network of family and friends.   But we respectfully submit that those factors do not override the need for a meaningful sentence for a defendant who has not fully acknowledged the extent of his wrongdoing.   Indeed, in his discussion of the Section 3553(a) factors ("Memo" at 12-15),[8] Guzzone hardly mentions the significant tax fraud activity in which he was involved, which included, as noted, the fraudulent omission of over $1,450,000 in income.   Nor does Guzzone make any meaningful mention of his organizational role in the underlying kickback scheme, involving multiple corrupt participants and millions of dollars of kickbacks over a multi-year period.   To the extent that Guzzone suggests (Memo at 13) that he pocketed the bribes because it was essential to get the highest quality work, that suggestion is unpersuasive for two principal reasons. First, numerous companies achieve high quality construction work without having their construction managers resort to soliciting millions in bribes from those performing the work. Second, Guzzone's memorandum fails to explain why he separately chose to cheat the IRS and his fellow taxpayers by willfully omitting the reporting of the ill-gotten bribe payments.   That tax fraud activity was not necessary to get his Bloomberg work done well; rather, it was attributable to pure greed.

---

[8]  Sentencing Memorandum on Behalf of Anthony Guzzone, Dkt. No. 20 (Jan. 5, 2021).

Guzzone also points to his acts of charity as a basis for a variance from the Guidelines. But in doing so, Guzzone ignores the fact that his ability to make the charitable contributions and engage in other good works resulted in some measure from the wealth that he accumulated as a result of the tax fraud and bribery schemes he devised.   Moreover, to the extent that Guzzone highlights the charity golf outing for the family of a deceased colleague, he leaves out one critical fact that undermines his argument:   the overwhelming majority of the "participants" in that annual affair were the sub-contractors from whom Guzzone was soliciting and receiving bribes. Those sub-contractors were, in effect, pressured by Guzzone into paying $5,000 to $10,000 participate, lest they lose their standing with the man who could decide whether they received future work.   Accordingly, these efforts hardly have the unalloyed altruistic purpose that Guzzone suggests.

In any event, the law is clear that a defendant's acts of charity cannot compensate for a defendant's criminal conduct, particularly conduct as lengthy, harmful, and brazen as Guzzone's. As the Seventh Circuit succinctly observed: "Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card."   *United States* v. *Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010).

In *Vrdolyak*, the court reversed a probation-only sentence for a white-collar criminal who defrauded his large institutional victim of $1.5 million.[9]   The court of appeals found it error for the

---

[9] The issue before the court in *Vrdolyak* was procedural unreasonableness, since the government appealed solely on that ground.   *See* 593 F.3d at 684.   *See also* Brief of the United States, *United States* v. *Vrdolyak*, No. 09-1891 (7th Cir. filed July 17, 2009), *available at* 2009 WL 2251149. But the court's reasoning applies equally to an analysis of substantive unreasonableness, and in particular to whether a sentence gives unreasonable weight to a defendant's charitable contributions and letters from the recipients of his patronage.

23

district court to give "enormous weight" to the charitable acts of the defendant "while virtually ignoring the evidence that tugged the other way." 593 F.3d at 682.   The court explained that charitable contributions "must be exceptional before they will support a more-lenient sentence" because "it is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives, to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts." *Id.* (quoting *United States* v. *Repking*, 467 F.3d 1091, 1095 (7th Cir. 2006)).   The court continued:

> To allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines. Such accommodation suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced. The very idea of such purchases of lower sentences is unsavory, and suggests that society can always be bought off, even by those whose criminal misconduct has shown contempt for its well-being.

*Id.* (quoting *United States* v. *McHan*, 920 F.2d 244, 248 (4th Cir. 1990)).

Likewise, in *Repking*, the Seventh Circuit rejected an (effectively) probationary sentence for a white-collar criminal, vacating as substantively unreasonable a one-day sentence of imprisonment in a million-dollar bank-fraud case — notwithstanding the defendant's restitution to his victim, his negligible chance of recidivism, his charitable works in the community, and even his cooperation with the government's criminal investigation.   *See* 467 F.3d at 1094-95.   Noting the Guidelines' policy statement that a defendant's charitable contributions are "not ordinarily relevant," *see* U.S.S.G. § 5H1.11, the court held that consideration of a defendant's charitable works "is not specifically prohibited, especially in a post-*Booker* world." *Id.* at 1095.   The court found substantively unreasonable the district court's ultimate conclusion that the defendant's

24

"charitable works were so extraordinary that they should be given weight despite the contrary view of the Sentencing Commission," stating:

> [W]e leave open the possibility that a one-day sentence of imprisonment might be justifiable for a defendant who rivals Robin Hood; but Repking, a millionaire who stole for himself and his friends, is not that defendant.

*Id.* at 1096.   *See also United States* v. *Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (defendant's civic contributions, not atypical for prominent businessman, did not support nine-level downward departure); *United States* v. *Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's charitable and other good works did not justify departure from Guidelines); *United States* v. *Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) (defendant's charitable and volunteer activities did not make him atypical).

Finally, the family-related factors that Guzzone cites should not tip the scales toward a variance. Simply stated, Guzzone fully understood the potential consequences to himself, his family, and his friends when he made the corrupt decision to organize and lead the lucrative criminal scheme for years.   He therefore has only himself to blame for the full range of those consequences.

In sum, none of the variance-related arguments advanced by the defendant mitigates his otherwise egregious and prolonged criminal conduct.

## IV.   <u>Restitution</u>

The defendant's tax crimes resulted in a deficiency of approximately $450,000, on which interest and penalties are owed.   He has known about these deficiencies for many years, and indeed signed tax forms acknowledging the tax deficiency in July 2020.   He also signed the plea

agreement in September 2020, in which he agreed to pay the taxes and interest, and not to contest the related fraud penalties.

Surprisingly, however, Guzzone has made payments to date totaling just $10,000, despite a total net worth of almost $1.6 million. Consistent with the terms of the plea agreement and the provisions of Title 18, U.S.C. § 3553(a)(3), the Government will present the Court with a proposed order directing the payment of the back taxes and interest. *See United States v. Adams*, 955 F.3d 238, 251-52 (2d Cir. 2020) (prejudgment interest properly included in restitution order because it "is part of the government's loss when delinquent taxes are not timely paid").

## CONCLUSION

The Government respectfully submits that, based on the facts and arguments set forth above, a sentence within the stipulated Guidelines range is appropriate here.

Dated:    New York, New York
          January 12, 2020

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        Acting United States Attorney

                                By:    _____S/_____
                                        David Raymond Lewis
                                        Assistant United States Attorney
                                        (212) 637-2397

                                        Stanley J. Okula, Jr.
                                        Special Assistant United States Attorney
                                        (202) 514-2839

cc:    Alex Spiro, Esq.
       John Chun, Esq.
       (by ECF)